427 So.2d 216 (1983)
James D. ARNOLD and M.H.J. Collins, Appellants,
v.
TACO PROPERTIES, INC., and Kenneth C. Smith and Elizabeth J. Smith, D/B/a the Taco Times, Appellees.
No. AK-116.
District Court of Appeal of Florida, First District.
February 10, 1983.
Rehearing Denied March 18, 1983.
*217 Robert D. Mendelson of Gardner, Shelfar, Mendelson & Duggar, Tallahassee, for appellants.
Roy T. Rhodes of Horne, Rhodes, Jaffry, Horne & Carruth, Tallahassee, for appellees.
WENTWORTH, Judge.
This is an appeal from a final judgment rendered pursuant to a jury verdict in favor of the defendants. Prior to the trial a hearing was held for the limited purpose of determining whether plaintiffs were public figures. The trial court found that they were, and that they would therefore be required to prove that the defendants (owners and publishers of The Taco Times, a bi-weekly newspaper of general circulation in Taylor County and surrounding areas) acted with "actual malice"[1] in publishing allegedly defamatory articles. This pretrial order is the basis of the primary point raised on appeal. We affirm.
Appellants are the major stockholders of the North Florida School of Medical Technology in Perry, Florida. Appellant Arnold is also the administrator of Doctor's Memorial Hospital in Perry, and Collins is the head technician in charge of the laboratory at that hospital. In the summer of 1977, Collins appeared on the "Good Morning Show" on WCTV[2] to promote the school. On the program Collins discussed the availability of an associate of arts degree from North Florida Junior College for work at the lab school.
On August 18, 1977, the chairman of the state licensing board[3] wrote Mr. Arnold and informed him that the board was in receipt of the school's renewal application. The chairman noted that the school had added thirty semester hours to its curriculum and had purportedly "effected an arrangement with North Florida Junior College so that students may earn an Associate in Arts degree from North Florida Junior College while pursuing the medical technician course." The letter informed Arnold that by making these representations the school may have been taken out from under the jurisdiction of the vocational-technical school licensing board and that it might have to submit an application to the State Board of Independent Colleges and Schools. The letter was accompanied by a notice that the school's renewal application was on the agenda for the August 30, 1977 meeting of the board, and attendance was requested. The minutes of the board's August 30 meeting reflect that a 30-day deferral for renewal was recommended, with subsequent licensure granted, provided the school would comply with seven specific conditions. Those conditions included deletion of any reference to any relationship with North Florida Junior College from the college's promotional publications, and "[t]hat the school clearly and fully explain ... any arrangement for the use of the Doctor's Hospital in the training of laboratory technology students."
In August and September of 1977, the Taco Times ran a series of articles on the *218 school and its relationship with the licensing board. As a result, appellants filed a complaint alleging that the articles contained false, defamatory statements. According to appellants, the articles falsely reported that the school had been in danger of losing its license because it had made misleading representations to the public about the benefits of enrolling at the school, and because the articles implied that Collins and Arnold were unscrupulous and dishonest. However, because the jury was instructed that it could find for the plaintiffs only if it found that the defendants published false statements with knowledge of their falsity or with reckless disregard of probable falsity,[4] the verdict does not reflect whether the jury found (1) that the statements were not false, or (2) that they were false but not made with actual malice.[5] Thus, the issue of whether plaintiffs were properly found to be public figures is the pivotal question upon which this case turns.
In Gertz v. Welch, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the U.S. Supreme Court clarified the situations in which the New York Times "actual malice" standard must be applied in a defamation action against a publisher or broadcaster. If the person who is the subject matter of the publication is a public official or a public figure, the standard should apply.[6] A person may be deemed a public figure either because he has achieved such pervasive fame or notoriety that he is a public figure for all purposes, in all circumstances, or because he "injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Gertz, 418 U.S. at 351, 94 S.Ct. at 3012. The latter classification is often referred to as the "limited public figure" concept,[7] and is the only category which could include appellants.
Although Gertz made it clear that the actual malice standard should apply when the plaintiff is a limited public figure, it provided little guidance for determining when a person has achieved that status. As the parties agree, the issue involves a mixed question of law and fact which was properly presented for the trial court's determination prior to the jury trial. Basically, two factors must be present before a person may be considered a limited public figure. First, the circumstances in which a person achieves public figure status must rise to the level of a public controversy and may not be a matter of mere public interest.[8] Second, the person must have voluntarily thrust himself into the vortex of that controversy.[9]
In support of their contention that the trial court should be reversed, appellants argue that the subject matter of the articles here in question was at most one of general public interest, not an identifiable public controversy. However, the subject matter of the articles concerned (1) a private school which trained technicians for employment in the health field, (2) that school's representations to the public through its catalog and through the television appearance of one of the directors, and *219 (3) the school's relationship to a publicly funded state college. Thus, the subject matter involved a consumer interest aspect in that it affected potential tuition-paying students and, ultimately, recipients of health care provided by graduates of the school. As such, the school and its relationship with the licensing board were not the "private affair" of the plaintiffs. Since the relationship did involve the representations made by appellants on behalf of the school, and the board's conditional renewal of the license, we conclude that the facts support the existence of an identifiable public controversy going beyond a matter of mere public interest.[10]
Appellants also argue that even if a public controversy existed, they did not thrust themselves into the vortex of it. Again, however, the facts support the opposite conclusion. Appellant Collins appeared on television to promote the school, and it was the content of that appearance which brought the possible infractions to the attention of the board. The plaintiffs also distributed promotional publications containing information which they were subsequently required to delete as a prerequisite to renewal of their license. In addition, the record reflects that appellants were repeatedly offered access to the media to rebut the alleged false statements.[11] The plaintiffs' own actions therefore caused the controversy, and we are unable to conclude that they were dragged unwillingly into the midst of it.[12] On the contrary, they were the central figures in the episode without whom there could have been no controversy.
Having determined that there is competent substantial evidence in the record[13] supporting a conclusion that an identifiable public controversy existed in which plaintiffs actively and voluntarily participated, we find that the trial court properly applied the law in ruling that plaintiffs were limited public figures for the purposes of this case.
In their second point on appeal, appellants challenge the trial court's jury instruction on the definition of actual malice.[14] However, the only objection to the instruction appearing in the record was made after the jury had retired, and was of a very general nature.[15] Thus, the record *220 does not disclose that a timely objection was made,[16] or that the trial judge was ever adequately advised of the grounds for the objection. Although we might have found some merit in appellants' contention that the instruction went too far in defining their burden, we decline to address the issue because it was not properly preserved. See, Henningsen v. Smith, 174 So.2d 85 (Fla. 2d DCA 1965); Page v. Cory Corp., 347 So.2d 817 (Fla. 3d DCA 1977).
Finally, appellants raise as error the order of the Leon County Circuit Court transferring the case to Madison County. However, since appellants' counsel specifically stated that they had no objection to a change to Madison County, this point was also waived.
AFFIRMED.
BOOTH, J., and McCORD, GUYTE P., Jr., Associate Judge (Retired), concur.
NOTES
[1] See New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
[2] WCTV is a Tallahassee based television station serving the North Florida-South Georgia area.
[3] State Board of Independent Post-Secondary Vocational, Technical, Trade and Business Schools.
[4] In their second point on appeal, appellants challenge the trial court's precise jury instructions on the actual malice standard. This point is discussed infra.
[5] Appellee conceded at oral argument that there could be no harmless error since the jury was instructed that it must find actual malice before finding liability, so that it conceivably never reached the question of the truth of the statement.
[6] In Gertz, the Court left to the states the decision of what standard to apply to private individuals. After in-depth analysis of the issue, the Third District has recently held that in Florida, the actual malice standard does not apply to private individuals. The Miami Herald Publishing Co. v. Ane, 423 So.2d 376 (Fla. 3d DCA 1982).
[7] Under the limited public figure concept, only statements relating to the controversy giving rise to the public figure status receive the protection of the actual malice standard. Gertz, supra.
[8] See Time Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976).
[9] Gertz, supra; Wolston v. Reader's Digest Assoc., Inc., 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979).
[10] In so holding, we caution that the finding is based on the interdependent circumstances of this case, and should not be construed as a blanket rule that any publication concerning a regulated business and its licensing board ipso facto involves a public controversy for purposes of finding a limited public figure status.
[11] In Gertz, the Court noted that one characteristic of a public figure is greater access than private citizens to channels of communication.
[12] Cf., Wolston v. Reader's Digest Assoc., Inc., 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979).
[13] Decisions of the trial court are, of course, clothed with a presumption of correctness and the facts must be viewed in the light most favorable to appellees. First Atlantic National Bank of Daytona Beach v. Cobbett, 82 So.2d 870 (Fla. 1955).
[14] The challenged instruction was as follows:

You are further instructed and I emphasize to you that neither negligence nor failure to investigate on the one hand, nor ill will, bias, spite, nor prejudice on the other, standing alone are sufficient to establish either a knowledge of the falsity of or a reckless disregard of the truth or falsity of the material used.
You should consider all of the evidence concerning Defendants' acts and conduct in publishing the articles and editorials in question, in deliberating upon whether the Defendants published said articles and editorials with actual malice.
There has been testimony in this case that demands were made by the Plaintiffs upon the Defendants to publish a retraction of the alleged false and defamatory statements in the news articles, and that Defendants failed and  that Defendants failed and refused to publish a retraction. Such evidence may be considered by you only as to the assessment of punitive damages, should you determine that Plaintiffs are entitled to such damages.
However, you are instructed that such failure or refusal, that is to publish a retraction, does not standing alone constitute actual malice within the requirements of Federal Constitutional Law, and alone does not justify an award in favor of Plaintiffs.
[15] After the jury retired the following colloquy took place:

MR. JUDKINS: Yeah, the parties stipulate that the record as far as objections to the Jury instruction are concerned, that an appellate record is preserved as to any objection that was, that could have been raised at the charge conference by either party.
MR. RHODES: By the stipulation, as reflected by the stipulation.
MR. JUDKINS: Oh, and I think both parties object to the instruction prepared by the Court that was not requested by either party.
MR. RHODES: Off the record.
(Whereupon, an off the record discussion was had).
MR. JUDKINS: Okay. Let's go on this way. In other words, the party  each requested for the Court to give their proposed instructions and only their proposed instructions, and object to, and object respectively to 
MR. RHODES: Each of us 
MR. JUDKINS:  each others' instructions.
MR. RHODES: And any instructions in addition to those requested by each party by the Court.
MR. JUDKINS: Right.
It is not clear what exactly the parties intended to preserve by this stipulation, but a stipulation cannot be relied on as preserving an appellate record when the record is devoid of information which would permit adequate review. Therefore, even if we were to assume that objections were timely made at the charge conference, we cannot assume that the judge was ever apprised of the grounds for the objection.
[16] Fla.R.Civ.P. 1.470(b).